In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-2614

LEONARD KIDD,

*Petitioner-Appellant,*

*v.*

MICHAEL LEMKE, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:11-cv-06839 — **Samuel Der-Yeghiayan**, *Judge.*

ARGUED OCTOBER 3, 2013 — DECIDED NOVEMBER 1, 2013

Before POSNER, FLAUM, and WILLIAMS, *Circuit Judges.*

FLAUM, *Circuit Judge.* Leonard Kidd was convicted of ten counts of murder in 1987 and sentenced to death. On appeal, his conviction was reversed and the case was remanded for a new trial. At his new trial, Kidd waived the assistance of counsel and represented himself, despite the trial judge's repeated warnings and advice. Kidd was convicted again, and is currently serving a life sentence. He now petitions for a writ of habeas corpus, arguing that his Sixth Amendment

rights were violated because his decision to represent him-
self was neither knowing nor voluntary. The district court
denied Kidd's habeas petition, and we affirm.

### I. Background

On October 28, 1980, a fire broke out in a Chicago apart-
ment building, killing ten children. Kidd became a suspect in
1984, following his arrest on unrelated charges.[1] He was
charged with arson and ten counts of murder, and his first
trial was in 1987. Robert Strunck, a public defender, repre-
sented him. Kidd was convicted on all counts and sentenced
to death. In 1992, the Illinois Supreme Court reversed his
conviction due to trial errors and remanded for a new trial.

We now set out this case's procedural history at some
length. Although we limited Kidd's current appeal to the
voluntariness of his waiver, Kidd draws upon several of his
earlier arguments, and earlier proceedings are relevant here.

### A. Kidd's waiver of counsel on retrial

After the remand, Kidd filed a pro se motion seeking ap-
pointment of counsel other than Strunck. At a July 1992
hearing, Kidd asked the court to appoint "Dan Webb or Jen-
ner & Block" as his new attorney. When the court asked
why, Kidd said that his was a capital case and that he would
"prefer for one of them to represent me." Strunck worked for
the public defender's office and Kidd "would rather for any-
one outside of the office to handle this case now." The court
told Kidd that it would not appoint Webb or Jenner & Block
to represent him, as he had "very competent" counsel. Kidd

---

[1] In this unrelated case, Kidd was ultimately convicted of arson and four
counts of murder.

responded that the public defender "did a well good job on this case," but continued, "[a]ll I am saying is that I feel that it would be my best interest, I would feel more secure and comfortable, you know—I don't want to have to go back on death row." The court told Kidd that Webb or Jenner & Block would have to represent him pro bono and then tabled the issue. Ultimately, Kidd was unable to find private counsel.

Kidd's case was set to go to trial in September 1994—more than two years after the remand. On August 23, 1994, Strunck told the court that Kidd wanted to proceed pro se. As the colloquy that followed is critical to our waiver analysis, we set it out at some length:

> **STRUNCK**: Mr. Kidd has also informed me after a recent jail visit that it's his desire in this matter to go, pro se.
>
> … Obviously, the relationship, I believe, goes back approximately 10 years.
>
> Now, I have explained to him that absolutely, he has a right to go pro se. It is not—probably not in his best interest. That it goes without saying, that Leonard Kidd is not a licensed attorney, in the State of Illinois or any other state nor does he have any formal legal education, legal training nor has he tried any cases.
>
> Basically, Judge, I have informed him that this is obviously not in his best interest to proceed, pro se. He wishes to address the Court on that issue.

Your Honor, obviously, he has a right to do as he pleases.

**COURT**: It would be disruptive or [a] hindrance to an orderly trial. Go ahead, Mr. Kidd?

**KIDD**: Yeah, I feel it is in my best interest to go, pro se.

**COURT**: Well, of course, I would disagree. I think you would be absolutely and totally foolish to undertake this trial without a good lawyer, an experienced lawyer in this case. A lawyer who has already [fought] one trial for you and knows the case and has always been extremely vigorous and energetic and conscientious in trying to defend you.

You know very well that you can receive the death penalty on this case. You were for 20 years in the Illinois Department of Corrections through natural life to the death penalty, and you would be called upon to make your own arguments, to make your own objections, gather your own legal written instructions at the end of the case, to introduce evidence.

You have, I think, a good idea from your trials, all that it takes to conduct a trial, to conduct a defense. And you would be called upon to do so.

**KIDD**: Yeah.

> **COURT**: Well—so, I really urge you not to try to undertake to defend yourself, but to stay with your lawyer.
>
> **KIDD**: It looks like that's my only way out. It looks like my best way out, though.
>
> **COURT**: Think about it again and see if you still have the same thought on September 7th, which is the trial date. It is going to go ahead on September 7th, whether you are your own lawyer or you wish Mr. Strunck to keep defending you.
>
> But particularly in this case, which is not a simple case, requires presentation of a good cross examination, involves the death penalty, which calls all kinds of things that you know about since you went through this trial already.
>
> I have real doubt whether you can do it yourself.
>
> **KIDD**: People sit right there on the stand and lied to you. I do it myself. I ain't going to go through what I did.
>
> **COURT**: We'll see. You better rethink it. We'll see you September 7th.

Kidd then asked for copies of "the transcript" and a court order for the law library. When the government discussed changes to its witness list, Kidd asked whether he needed to prepare a list as well. He told the court that he was definitely going to add witnesses. The court then gave the parties a

deadline; Kidd said the date was "cutting it short" but he would try his best to meet it. When the court pointed out that it would be difficult for Kidd to meet deadlines while in custody, Kidd responded, "[b]ut sometimes you have no choice, when people sit right there on the stand and lie, too."

The court followed up with Kidd's pro se request a week later, on August 31, 1994:

> **COURT**: Mr. Kidd, do you still have that in mind, or are you agreeable to having Mr. Strunck continue to represent you?
>
> **KIDD**: I still have that in mind.
>
> **COURT**: You realize that this case is going ahead to trial next week, so you would have to be ready to represent yourself next week? Do you understand that?
>
> **KIDD**: Yes.
>
> **COURT**: … You're charged with ten counts of murder and a count of arson, aggravated arson, I believe. And I must tell you then the nature of those charges, which I think you already know since you went through a trial on them.
>
> Secondly, you should also know that on the murder charges, the minimum is 20 years, and the maximum is the death penalty. You understand that that's the minimum and the maximum. 20 years is the minimum; the death penalty is the maximum.

If there's a penitentiary sentence, the sentences can run concurrent, together at the same time, or consecutive, one to follow the other.

You also must be informed, and I'm sure you already know, that you have a right to counsel, and if you are indigent, without money, counsel, Mr. Strunck, the public defender, will be appointed for you. Do you understand?

**KIDD**: Yeah.

**COURT**: Now, the other thing, as I think I mentioned to you before, if we go to trial on this case and you act as your own lawyer, you're going to be responsible for your defense. You're going to be responsible to present evidence according to the rules of evidence and the rules of procedure.

You're going to be responsible for cross-examining witnesses against you. You're going to be responsible for bringing in appropriate instructions that you might want, legal instructions. All the kinds of things you saw your lawyer do during the first trial, that's your responsibility.

You can't order Mr. Strunck to do this for you and then order him to sit down, and you'll carry on from there. You're responsible for your own defense. That means presenting evidence, it means cross-examining, it means introducing possibly exhibits into the case, it means having

> legal instructions at the end of the case. Do you understand that?
>
> **KIDD**: Yes.
>
> **COURT**: And knowing all those things, do you still wish to represent yourself?
>
> **KIDD**: Yeah.

The court then allowed Kidd to proceed pro se, with Strunck as standby counsel. Kidd was again convicted of all charges. At Kidd's request, Strunck represented him during the penalty phase of his capital case.

## B. Penalty phase and post-trial motions

During the penalty phase, the defense presented mitigation evidence. Dr. Linda Wetzel found that Kidd's 1993 IQ test score, 73, placed him in the borderline mentally retarded range according to one accepted classification scheme, and "at the high end of the mentally retarded range of intelligence" according to another. Moreover, Kidd had a seizure disorder and suffered from "impaired brain functions." His memory and concentration were very poor; if sentences became too complex, Kidd needed repetition and for the speaker to slow down. However, she found that Kidd was "good at expressing himself." Another defense expert, Dr. George Savarese, testified that Kidd had been diagnosed as mentally retarded three times during his youth (after IQ tests of 64, 67, and 63 in 1968, 1971, and 1976, respectively).

The parties also stipulated that the state's psychiatrist examined Kidd in 1985 and said he was malingering. Ultimately, Kidd was again sentenced to death. (In 2003, Illinois Gov-

ernor George Ryan commuted all death sentences, Kidd's included, to life in prison without the possibility of parole.)

Strunck and Kidd both filed post-trial motions for acquittal, which the trial court denied. In his pro se motion, Kidd claimed that during his trial he used cocaine, marijuana, and the antidepressant Sinequan, which he said he took under medical direction. He asserted that Sinequan made him drowsy during trial. He did not specify which drugs, if any, he had used at the time of his waiver. The trial court did not find Kidd's account credible, saying that Kidd "was competent, was totally mentally fit, he was sober as anyone in the Courtroom, and he didn't do a bad job as his own lawyer."

## C. Direct appeal to the Illinois Supreme Court

Kidd appealed to the Illinois Supreme Court.[2] He argued that under state law, he should have received a pretrial competency hearing due to his use of psychotropic drugs. Illinois law mandates that a defendant receive a formal competency hearing when taking psychotropic drugs under medical direction, *see* Ill. Code Crim. Pro. § 104-21(a); however, the court found that the record did not clearly establish that Kidd had taken Sinequan under medical direction. The court further found that Dilantin—an anti-seizure medication that Kidd claimed he had also taken throughout the trial—did not qualify as a psychotropic drug.

Kidd also argued that he did not knowingly and intelligently waive his right to counsel because he was "a brain-damaged and epileptic man who depended on anti-seizure

---

[2] Attorney Strunck did not handle Kidd's direct appeal, nor any other stage of Kidd's proceedings.

medication and who also received anti-depressants." His condition prevented him from making a knowing and intelligent choice, he argued. In addition to his claims of drug use, Kidd relied on Dr. Wetzel and Dr. Savarese's testimony about his mental impairment and the possibility that he was mentally retarded. The Illinois Supreme Court noted that there was disputed evidence in the record as to which medications Kidd was taking and at what times. It also found that the parties' experts had disputed the extent of Kidd's mental impairment, if any. The court thus held that it was "unable to say that [Kidd's] purported mental limitations and disabilities precluded his knowing and intelligent waiver."

## D.  Postconviction proceedings in the trial court

At the initial stage of his state postconviction proceedings—before the same judge who presided over his trial—Kidd renewed his argument that the court should have ordered a formal competency hearing because Kidd was taking psychotropic drugs under medical direction. Kidd also argued that his waiver of counsel was not voluntary.

In arguing that he should have received a competency hearing, Kidd produced medical records showing that he was indeed taking Sinequan at the time of his August 1994 waiver and throughout his second trial. In addition, Kidd included a report by Nancy Cowardlin, who concluded that Kidd had severely subaverage intelligence and lagged functionally. Kidd also submitted the affidavit of Dr. Deborah Mash. After reviewing the trial record, Kidd's medical records, and his psychiatric and psychological reports, Dr. Mash diagnosed Kidd with Organic Brain Dysfunction and mental retardation. She found that Kidd had been prescribed Sinequan throughout August and September of 1994, and

that the Sinequan would have significantly slowed Kidd's cognition and thought processes. Sinequan's effect on Mr. Kidd "required that a fitness evaluation be conducted before trial to determine Mr. Kidd's competence to waive counsel, his ability to understand the nature of the charges against him, and his ability to assist in his own defense." Dr. Mash also found that the medical records showed that Kidd had taken Dilantin throughout his trial, which constituted an additional reason that a competency hearing should have been conducted before Kidd's waiver and trial.

The trial court was not persuaded by this new evidence. It found nothing that called into question its conclusion—and the Illinois Supreme Court's conclusion—that Kidd was at all times competent to waive counsel and stand trial.

Kidd also argued, for the first time, that his waiver of counsel was involuntary. He said that he had no choice but to represent himself because of Strunck's ineffective assistance and the trial court's refusal to appoint other counsel. Kidd claimed that Strunck had abandoned his duty of loyalty to Kidd and was unwilling to prepare adequately for Kidd's second trial.

Kidd submitted several affidavits in support of his claim. His new public defender, Richard Cunningham, said that in June 1988—before Kidd's first trial—Cunningham observed a handwritten sign in Strunck's office that read "Leonard Kidd 14, Society 0."[3] Cunningham added that when he first contacted Strunck to discuss Kidd's case, Strunck became

---

[3] In the instant case, Kidd was charged with killing ten people in 1980. He was also charged with killing four other people in a later, unrelated incident.

angry, used profanity to describe Kidd, and said that Kidd's going pro se was "his little scam." Kidd also submitted an affidavit from another detainee at the same jail, Ronald Kliner, who said that he had observed hostile interactions between Strunck and Kidd. After one conversation in which Strunck refused to interview or call at trial certain witnesses whom Kidd suggested, Strunck allegedly told Kidd, "If you don't like me being your lawyer—do it yourself. I'll ride with you on the helicopter to your execution!" Kidd also submitted his own affidavit. He said that Strunck tried to convince him to plead guilty; that Strunck became angry when Kidd refused to do so; that Strunck said the jury would find Kidd guilty again; that Strunck rejected Kidd's trial advice; and that Strunck said he would just "go through the motions" at trial. Under these circumstances, Kidd said, he felt that he had no choice but to represent himself.

The trial court rejected Kidd's claim that his waiver of counsel was involuntary. The court said it had observed no antagonism between Kidd and Strunck at any time after the remand. In fact, the court stated that Strunck had "fought" for Kidd in both trials. The court noted that Kidd had invited Strunck to return as his counsel during the sentencing phase and for post-trial motions. Even if Strunck did hold personal animosity toward Kidd, the court reasoned, that did not mean he had given such ineffective assistance that Kidd had no choice but to represent himself.

### E. Postconviction proceedings in the Illinois Appellate Court

Kidd appealed to the Illinois Appellate Court, raising two arguments. First, he argued that the trial court should have ordered a competency hearing because there was suffi-

cient evidence at the time of his waiver to support a "bona fide doubt" of his competency. *See* Ill. Code Crim. Pro. § 104-11(a). The Illinois Appellate Court held that Kidd procedurally defaulted this claim by not raising it on direct appeal. In any event, the court found, the additional proof of Kidd's use of medication and mental impairment was insufficient to establish a bona fide doubt of his fitness at the time of the waiver. The court noted that there was no evidence that Kidd displayed any erratic behavior. It emphasized that "after over two years of observation, the trial court concluded that defendant was competent, totally mentally fit and his efforts as pro se counsel supported that finding."

Second, Kidd renewed his argument that he had no choice but to proceed pro se because Strunck was unprepared and had "abandoned" him. The Illinois Appellate Court also rejected this theory. It found that the record did not support Kidd's claims about Strunck's ineffectiveness. It reasoned that Strunck had already gone through one trial, so he could not be considered unprepared. And it dismissed Kidd's contentions about Strunck not calling certain witnesses as mere disagreements over trial strategy. It further found that Kidd's allegations of Strunck's hostility toward Kidd were contradicted by the trial court's observations of Strunck when he acted as counsel and standby counsel.

In sum, the Appellate Court found no reason to doubt the trial court's assessment that Kidd's waiver was knowing and voluntary: "The record indicates that defendant was properly questioned and admonished by the trial court and simply decided that he would be best suited to represent himself against the witnesses he believed were lying." The Illinois Supreme Court declined to hear Kidd's appeal.

**F. Habeas review**

Kidd then filed a habeas petition in federal district court. First, he raised his competency claim again. Second, he argued that his waiver was not knowing and voluntary.

The district court denied the petition. It agreed with the Illinois Appellate Court that Kidd's competency claim was procedurally defaulted. Nonetheless, it found the claim meritless: "the record does not reflect a basis for the trial court to have found a bona fide doubt as to Kidd's fitness to proceed pro se." The district court agreed with the Illinois Appellate Court's assessment of Kidd's lack of erratic behavior, the conflicting expert testimony about his mental capabilities, and the fact that he had changed his story about drug use.

In rejecting Kidd's argument that his waiver was not knowing and voluntary, the district court found that the Illinois Appellate Court's conclusion was neither an unreasonable application of Supreme Court precedent, nor based upon any unreasonable finding of fact. The district court reviewed the trial court's discussions with Kidd before his waiver and concluded that the record "clearly indicate[s] that Kidd was cognizant of what he was doing."

We limited Kidd's current appeal to the issue of whether his waiver of counsel was knowing and voluntary.

## II. Discussion

We may grant a writ of habeas corpus only if the petitioner's custody is "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Where the state court adjudicated the petitioner's claim on the merits, its decision must either be (1) "contrary to, or involve[] an unreasonable application of, clearly established Federal

law, as determined by the Supreme Court," or (2) have "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court." *Id.* § 2254(d)(1)–(2). The state court's factual findings are presumed correct, and rebutting them requires clear and convincing evidence. *Sturgeon v. Chandler*, 552 F.3d 604, 612 (7th Cir. 2009). If the petitioner can show that a state court's decision was unreasonable under § 2254(d), we review the petitioner's arguments de novo. *See Williams v. Taylor*, 529 U.S. 362, 406 (2000). Otherwise, we defer to the state court's decision. We review the final reasoned opinion by the state courts—in this case, the Illinois Appellate Court's decision denying postconviction relief. *See Charlton v. Davis*, 439 F.3d 369, 374 (7th Cir. 2006).

Kidd argues that the Illinois Appellate Court unreasonably applied Supreme Court precedent as to what constitutes a knowing and voluntary waiver. We must deny the writ if we can posit arguments or theories that could have supported the state court's decision, and if fairminded jurists could disagree about whether those arguments or theories are inconsistent with Supreme Court holdings. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1402 (2011).

## A. Sufficiency of the trial court's warnings

The Sixth Amendment guarantees a criminal defendant "the right to counsel at all critical stages of the criminal process," *Iowa v. Tovar*, 541 U.S. 77, 80–81 (2004), but also the right "to proceed *without* counsel when he voluntarily and intelligently elects to do so." *Faretta v. California*, 422 U.S. 806, 807 (1975). The defendant's waiver of counsel must be knowing, intelligent, and voluntary. *Tovar*, 541 U.S. at 88.

The Supreme Court has said that a waiver is "knowing and intelligent" when the defendant "knows what he is doing and his choice is made with eyes open." *Id.* (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)). However, the Court has "not … prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel." *Id.* Instead, the Court has instructed that "[t]he information a defendant must possess in order to make an intelligent election … will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding." *Id.* (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

Under this standard, the trial court's warnings were sufficient. The court explicitly warned Kidd about "the hazards ahead." *Id.* at 89. In their first colloquy, the judge explained to Kidd that the case was complex, the potential consequences were grave, the time-frame before trial was brief, and the challenges of representing himself were many. The judge told Kidd that he would need to perform all the tasks that his attorney, Strunck, had performed at the first trial. The judge advised Kidd against proceeding pro se, told him to rethink this major decision, and gave him a week to do so. One week later, they engaged in another colloquy. The judge again emphasized the short timeline, the seriousness of the charges, the fact that Kidd faced the death penalty, and the complexity of conducting his own defense. The court added that Kidd had the right to a lawyer, even if he could not afford one. The court's warnings "rigorous[ly] conveyed" the dangers of Kidd's choice. *Id.* (quoting *Patterson v. Illinois*, 487 U.S. 285, 298 (1988) (internal quotation marks omitted)).

## B. Kidd's subjective understanding

Kidd argues that the trial court did not sufficiently determine whether Kidd subjectively *understood* its warnings. Even if a person of ordinary intelligence would have realized the import of the court's warnings, Kidd contends, the court did not do enough to confirm that Kidd himself took any meaning from them.

We first note that the defendant's competence to waive counsel is a separate inquiry from whether the defendant's waiver is knowing and voluntary. "The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings." *Godinez v. Moran*, 509 U.S. 389, 401 n.12 (1993). "The purpose of the 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced." *Id.*

Kidd has already lost on his competency claim. The Illinois Appellate Court held that the trial court had no reason to doubt his fitness to waive counsel; accordingly, the court committed no error by failing to order a competency hearing. *See Godinez*, 509 U.S. at 401 n.13 ("[A] competency determination is necessary only when a court has reason to doubt the defendant's competence."). The state courts also found that Kidd was, in fact, competent at the time of his waiver and throughout trial, and our review does not extend to that determination.

But even accepting that Kidd had the ability to understand the significance and consequences of his waiver, the question remains whether he actually understood the gravi-

ty of his decision. Kidd argues that the trial court did not sufficiently ascertain this fact. He suggests that if the trial court had conducted a meaningful inquiry into his medical history, current health, and mental capabilities, it might have learned that he had serious cognitive disabilities and was taking potentially mind-altering medications.

The Supreme Court was clear in *Godinez* that a court is not required to make a competency determination in every case in which a defendant seeks to waive counsel. 509 U.S. at 401 n.13. However, Kidd seems to be calling for something less than a full-fledged competency hearing. He suggests that the trial court should have asked him *some* questions designed to ascertain his ability to comprehend information— questions about his education, mental health background, current medical conditions, or whether he was on medication. The trial court did not ask any of these more targeted questions in either waiver hearing. Instead, it explained the significance of the waiver and Kidd's right to counsel, and at various times paused and asked Kidd whether he understood. Kidd responded in the affirmative each time. In Kidd's view, the trial court "solely relied on Kidd's word."

Kidd faces a substantial hurdle in arguing that the trial court should have done more: the combination of (1) the standard in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) and (2) the Supreme Court's somewhat indeterminate guidance in this area. Under AEDPA, a court conducting reasonableness review focuses on "whether the state court's application of clearly established federal law is *objectively unreasonable,* not whether it applied clearly established federal law correctly." *McCarthy v. Pollard*, 656 F.3d 478, 483 (7th Cir. 2011). Although the Supreme Court has

called for a trial court's pre-waiver procedures to be "rigorous," *Patterson*, 487 U.S. at 298, the Court "has not provided extensive direction on the nature of the rigorous restrictions … and procedures that a court must observe." *Smith v. Grams*, 565 F.3d 1037, 1046 (7th Cir. 2009) (brackets and internal quotation marks omitted). Therefore, we have said that a trial court's failure to formally inquire into a defendant's background and subjective understanding is "not fatal" to finding a valid waiver. *United States v. Todd*, 424 F.3d 525, 533 (7th Cir. 2005). Instead, we look to the specific facts and circumstances of each case to determine whether the trial court was justified in concluding that the defendant's waiver was knowing. *See Johnson*, 304 U.S. at 464 ("The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.").

Under this approach, the trial court's evaluation of Kidd's subjective understanding was sufficiently thorough. Kidd cannot identify one specific fact that should have alerted the court to his allegedly impaired faculties. There simply were no red flags, before or after the waiver. As the state courts repeatedly noted, Kidd never displayed any erratic behavior. The trial court found him lucid and responsive at all times. Moreover, Kidd does not allege that he or Strunck told the trial court that he was on medication until the posttrial stage, at which point the trial court did not believe Kidd. Kidd insists that because the court "was dealing with an epileptic, brain damaged, mentally retarded and mentally ill defendant," it should have done more. But the court had no reason to know that there was any possibility that Kidd did not understand the significance of his actions.

Several considerations support the trial judge's conclu‐
sion. First, Kidd represented his waiver as a strategic deci‐
sion. He told the judge on multiple occasions that it was in
his "best interest" to represent himself because, in his view,
witnesses had committed perjury during his first trial. When
a defendant's choice appears to be "a strategic decision …
made so that he could pursue the case as he desired," it
tends to show that the choice was intelligently made. *United
States v. Volpentesta*, 727 F.3d 666, 678 (7th Cir. 2013). Second,
throughout his pretrial hearings, Kidd demonstrated that he
was lucid and had some awareness of what conducting a de‐
fense required. He took steps—unprompted—to prepare for
trial. During the August 23rd hearing, he asked the court for
the transcript and a pass to the law library. He paid attention
during the court's discussion of the government's witness
list, and interrupted to ask whether he would need to pre‐
pare a witness list, too. He expressed dismay at a deadline
the court gave him, but said he would try his best to meet it.
All of these statements tended to show that Kidd understood
what was going on and what he was agreeing to. Finally,
Kidd had already been through two capital murder trials; in
fact, he had been through this exact trial before. A "defend‐
ant's prior experience with the judicial system tends to show
that he understood that the charge against him was serious
and that he was accepting a risk by representing himself."
*Todd*, 424 F.3d at 533.

We have said that *Johnson v. Zerbst*'s waiver standard
"can be met without a demonstration that the accused has a
deep understanding of how counsel could assist him." *Unit‐
ed States v. Hill*, 252 F.3d 919, 925 (7th Cir. 2001). This is not
to discount the "serious and weighty responsibility" that tri‐
al courts have in determining whether a defendant knowing‐

ly waived a constitutional right. *Von Moltke v. Gillies*, 332 U.S. 708, 723 (1948). This responsibility requires "a penetrating and comprehensive examination of all the circumstances under which such a [waiver] is tendered." *Id.* at 724. But the Constitution only requires the court to investigate as thoroughly as the particular circumstances of the case require. *Id.* Here, the trial court's investigation was as thorough as the circumstances called for—and in any event, it was not objectively unreasonable for the Illinois Appellate Court to find the trial court's investigation sufficient.[4]

## C. Whether Kidd's condition prevented him from making a knowing and intelligent choice

Kidd also argues that his condition did, in fact, prevent him from making a knowing and intelligent choice. He states that "[c]learly, the drugs prescribed and taken had an effect on whether or not [he] knowingly and voluntarily waived … his right to counsel in his *capital murder* trial." He also points to the expert opinions regarding his low IQ, the possibility that he is mentally retarded, and his severe learning disabilities—all of which establish, he claims, that he lacked the requisite mental capacity to waive counsel.

Kidd is precluded from arguing that he was not competent to waive counsel; he can only argue that although he had the ability to understand his choice, his IQ and medica-

[4] Indeed, if we held that the trial court was required to inquire into Kidd's mental and medical history on the facts of this case, we would arguably be mandating that trial judges *always* ask these kinds of questions when a defendant seeks to represent himself. That would be the kind of one-size-fits-all script that the Supreme Court explicitly eschewed in *Tovar*. *See* 541 U.S. at 92.

tion prevented him from actually understanding the choice at the time of his waiver. The factors discussed above—the strategic nature of Kidd's decision, his presence of mind during both waiver hearings, and the fact that the trial court never had a reason to doubt his lucidity—indicate that it was not objectively unreasonable for the Illinois Appellate Court to discount Kidd's expert testimony in light of what occurred on the record. Even Kidd's strongest experts could only speculate as to Kidd's state of mind at the time of the waiver. As such, Kidd has not put forth "clear and convincing evidence" to rebut the state court's factual finding that during the two weeks in which he persisted in his request to proceed pro se, Kidd understood the nature of his decision.

Kidd also argues that he was unable to serve as an adequate substitute for an attorney, stating that he cannot read or write, has the vocabulary of a five year old, and has poor memory and communication skills. These deficiencies, he argues, would have severely hindered him in his ability to complete basic trial tasks, let alone try a capital case. Yet when it comes to the right to represent oneself, these arguments are "not relevant." *Faretta*, 422 U.S. at 836 ("[T]echnical legal knowledge, as such, [is] not relevant to an assessment of [the defendant's] knowing exercise of the right to defend himself."); *id.* at 834 ("It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts."). Whether Kidd could effectively represent himself is unrelated to whether his waiver was knowing and voluntary.

**D. Voluntariness of Kidd's waiver**

Kidd also claims that his waiver was not voluntary because he "felt pressured into representing himself." Kidd felt

that he had "no choice" but to represent himself because Strunck suggested that he would not provide help and showed outright hostility toward Kidd.

The Supreme Court has said that a waiver is voluntary if it uncoerced. *Godinez*, 509 U.S. at 401 n.12. The Illinois Appellate Court found that "the record does not support defendant's contention that he was abandoned and forced to proceed pro se." This conclusion was not objectively unreasonable.

As the trial court noted, it had observed Strunck and Kidd for over two years, throughout the first trial and after the remand. The court never had reason to doubt their viable working relationship. It is true that before Kidd requested to go pro se, he had asked for private counsel instead of Strunck. He said that he would rather that "anyone outside" of the public defender's office handle his case. But when the court asked for his reasons, Kidd never suggested that he and Strunck had a difficult relationship or that Strunck had abdicated his responsibilities. In fact, during the hearing on Kidd's motion for private counsel, he acknowledged that Strunck "did a well good job on this case." Kidd said that he thought he would have a better chance of acquittal with someone other than a public defender—not that he felt Strunck had abandoned the case. Moreover, Kidd did not mention Strunck during the two August hearings on his request to waive counsel. Finally, Kidd invited Strunck to return as his counsel for sentencing and post-trial motions.

Kidd put forth affidavits relaying off-record interactions between him and Strunck. He also introduced his postconviction attorney's observations of Strunck's hostile attitude toward Kidd. But the Illinois Appellate Court was not un-

reasonable in finding that the assertions in the affidavits did not outweigh what the trial court observed on record before and around the time of the waiver. This is especially true because several allegations in the affidavits occurred at indistinct times or several years before or after Kidd's waiver. The allegations in these affidavits are certainly troubling, if accurate; but on this mixed record, we cannot conclude that it was unreasonable for the state court to discount the affidavits in favor of the record evidence.

### III. Conclusion

For the foregoing reasons, we AFFIRM the denial of Kidd's petition for a writ of habeas corpus.