In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-1573

MACK A. SIMS,

*Petitioner-Appellant*,

*v.*

WILLIAM HYATTE,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:14-cv-01936-RLM — **Robert L. Miller, Jr.,** *Judge.*

ARGUED NOVEMBER 27, 2018 — DECIDED FEBRUARY 1, 2019

Before BAUER, HAMILTON, and BARRETT, *Circuit Judges*.

BAUER, *Circuit Judge.* Petitioner-appellant Mack Sims seeks
a writ of habeas corpus, arguing his due process rights were
violated because the state withheld evidence favorable to his
case. In November of 1993, security guard Shane Carey was
shot in Elkhart, Indiana. Approximately fifteen to twenty
minutes after the shooting, the Elkhart police found Mack Sims
near a walking path around twenty feet from where the
shooting occurred. After Carey identified him at trial as the

shooter, Sims was convicted of attempted murder and sentenced to a term of imprisonment of 35 years. In 2012, during a post-conviction evidentiary hearing, Sims learned the prosecution withheld evidence that Carey, the only witness who could identify the shooter, was hypnotized before trial to enhance his recollection of the shooting. After the Indiana courts denied habeas relief, Sims filed a petition for a writ of habeas corpus in federal court. The district court held that the Indiana court did not unreasonably apply established federal law and denied the petition. Because we disagree, we reverse.

## I. BACKGROUND

### A. The Night of the Shooting

In September of 1993, Shane Carey began working as a security guard at Sister Virginia's Adult Basic Education ("Sister Virginia's") in Elkhart, Indiana. On November 2, 1993, the school was in session when Carey arrived for his shift at 6:00 p.m. Shortly after arriving he traversed the premises and returned to his car to read a book after he was satisfied the school was safe. Sister Virginia's parking lot, where his car sat, had some lighting but was not well lit.

Around 7:00 p.m., Carey noticed three black men walk behind a nearby building and emerge in the parking lot a few minutes later. The men walked toward Carey's vehicle; two walked to the passenger side and one to the driver's side. When about two feet from the car the individual walking towards the driver's side door grabbed a gun from his coat and fired it through the window. Carey did not see the gun, but soon realized he had been shot in the face. He made his way into Sister Virginia's and emergency help was summoned. Carey testified at trial that the shooting took place "shortly after 7:00 [p.m.]."

Officers Tom Lerner and William Wargo arrived on the scene at 7:27 p.m. Lerner instructed Wargo to secure Carey's vehicle and the area around it while he entered Sister Virginia's to speak with Carey. Carey was having difficulty speaking but was able to provide Lerner with a description of the assailant as a black male with short hair or a shaved head and a large build, possibly in his late twenties, wearing a three-quarter-length coat with dark pants and dark combat boots.

At approximately 7:30 p.m. while standing near Carey's car, Officer Wargo heard a noise near the train tracks about twenty-five feet southeast of Carey's vehicle. Wargo then observed a black male crouching behind a dumpster wearing a black three-quarter length jacket and hat looking onto the crime scene. This individual was near a walking path that ran next to the train tracks and was often used by locals. The officers ordered the subject out of the bushes and he came forward without protest. They identified this individual as Mack Sims and patted him down for weapons; none were found.

Although there were civilian witnesses in the area, none were able to give an identifying description of the shooter. Police officers searched the surrounding area extensively but never found a gun, nor did they recover a shell casing from the area or any other physical evidence.

## B. The Trial of Mack Sims

On November 4, 1993, Sims was charged with attempted murder. His trial began on August 23, 1994. The prosecution called ten witnesses: six were law enforcement officers that described their role in the investigation and three were individuals present at Sister Virginia's the night of the shooting that were unable to identify the shooter. Thus, the state relied

almost exclusively on the only witness who could possibly identify the shooter, Carey, to establish their case against Sims.

Carey testified that he got a good look at the assailant. He described in court what he saw the night of the shooting in more detail than was in the incident report:

Q: Now, as he approached the car, did you get a look at him?

A: Yeah. I was looking him square in the eyes.

Q: Describe what you saw.

A: What I saw was a man with—it was a somewhat full face, well—I'd say a well-rounded face. What I mainly noticed was the eyes. And I noticed underneath the left eye the skin tone, I'd say, or shades were slightly different than the other. One side just underneath the eye was a little bit lighter and the other side was very dark. And I noticed—I did notice the eyes. It was a very cold stare.

Q: Did you see him reach for anything?

A: I saw him make a hand movement, and that's about it. I saw a flash but nothing more.

Q: Okay. Do you recognize in this courtroom today the person you saw and who shot you on November 2nd, 1993?

A: Yes, I do.

Q: Where is he?

A:  He's sitting right there in front of me (indicating).

Mr. Wicks [ the prosecutor]:

> I would ask the record reflect the witness has identified the defendant, Mack Sims, Your Honor.

The Court:

> Let the record reflect the witness has identified the defendant.

Carey continued to describe the assailant,

> I noticed the shoes looked somewhat like boots, I would say, and dark color pants. What I mainly noticed was the coat. The coat was slightly long and dark in color, either a dark black or maybe bluish or—like a Navy or midnight blue or something to that extent. One of the things I did notice on the coat was a patch on the arm … It was a small patch. I didn't really get a good look at the shape, but it couldn't have been more than a couple inches in diameter.

Carey then observed the coat Sims was wearing when he was arrested and identified a patch on it as being the one he witnessed when the assailant approached his vehicle. Carey also testified that detective John Faigh came to speak with him at the hospital the day after his surgery. He recalled being presented with six photos. Carey chose a photograph from this lineup noting that the picture "looked like" the assailant. Carey then identified in court the photograph of Sims that he picked out of that lineup.

During cross-examination defense counsel pointed out that Carey's identification of the assailant in the photographic lineup was not unequivocal. Carey indicated that he had unequivocally identified the assailant in a photographic lineup that appeared nowhere in the record:

A: The identification that I was provided with in the emergency room was [unequivocal]. They did show me something in the emergency room. It was difficult to see, but what I did see, that was him.

Q: Oh, there was another picture that was shown to you?

A: There was another picture in the emergency room.

Q: There is nothing in the reports about that: is that correct?

A: Not that I know of.

Carey was then asked about a situation shortly before trial in which he was unable to identify the assailant in a photographic lineup:

Q: And you also recall, maybe even last week, looking at a photo lineup when Mr. Wicks was around?

A: Uh-huh.

Q: And you again said that it looks like but you couldn't be sure because of some facial hair?

A: Yeah, the facial hair did throw me off, but I will not forget the eyes. The eyes are the one thing that I do remember.

Q: Now you indicated—yeah, you have talked about the eyes, but you didn't say anything in your statement about the eyes.

A: That's the one thing that I do remember.

Q: But you didn't tell the police about it at the time?

A: No. But like I said, I was also very groggy.

Sims later testified and his mug shot showed that he had facial hair, a mustache and goatee, at the time he was arrested.

Additionally, Carey testified that the photograph of Sims in the emergency room that was not part of the record was shown to him by itself and not as part of a photographic lineup:

Q: And you indicated now that there was another picture that you were shown, a single picture you were shown, in the emergency room?

A: I was shown that in the emergency room. If I recall, my—my parents were in the emergency room, but I'm not sure if they were in there when they showed me this picture. They did show me a picture in the emergency room.

Carey stated the lighting in the parking lot was "somewhat—subdued would be the word I'd use, somewhat faint." Carey also testified that he was not wearing his glasses the night of the shooting, although his vision was not so poor that he was required to wear them to drive.

Defense counsel impeached Carey regarding inconsistencies in his description of the assailant. The defense pointed out that the description of the assailant included that he had short hair or was bald. However, Sims later testified that his hair was not short or shaved but was curly and longer at the time he was arrested. The defense pressed Carey on his description of the shoes worn by the assailant. Carey had described the assailant as wearing black combat boots; Sims later testified that he was wearing black and white Nike sneakers. The defense also noted that Carey had indicated the assailant was wearing black pants, but Sims testified that he was wearing blue jeans. The defense asked Carey if there was a hood on the coat, to which Carey responded that his memory had im-

proved over time on the matter: "I recall—I did not recall it at the time. Later on I did recall a hood, and it was part of the way up." During direct examination Sims testified that he was wearing an Orlando Magic baseball cap when he was arrested. Furthermore, the defense pointed out that the distinct patch detailed in direct examination and used to identify Sims's coat was never mentioned in his description of the assailant.

After Carey stepped down from the witness stand the defense moved for a mistrial based upon the testimony elicited from Carey:

> [Carey] testified that while he was in the emergency room immediately after being shot that he was shown a single photograph of the defendant. The defendant would indicate to the Court that the type of identification process, being a single photograph, is prejudicial and suggestive and clearly taints any subsequent identification that may have been made in this matter … Based on that single photographic identification, I believe that the in-court identification was tainted by the suggestive nature of the initial identification.

The court denied the motion stating there was no evidence from the state or defendant that indicated a single photograph was ever shown to the victim. The court stated the only way it could be assumed that a single photograph lineup occurred was by accepting everything Carey said was true, which was not required. The court also found the in-court identification

sufficient to overcome any undue suggestiveness of a single photograph lineup.[1]

Closing argument took place on August 24, 1994. The prosecution leaned heavily, almost exclusively, on Carey's testimony: "He has identified as the shooter this defendant, Mack Sims, and he has never hesitated a bit in that identification. And that, of course, is what this case is about is the validity of that identification." The jury found Sims guilty of attempted murder.

### C. The Sentencing and Appeal Process

Sims was sentenced to 35 years' imprisonment on December 1, 1994. The defense filed a motion for a new trial on December 29, 1994, arguing "the Court erred when it allowed the identification evidence of Shane Carey in that it was tainted

---

[1] It is worth noting at this point that gleaning from the record precisely when photographic lineups were conducted and their result is difficult. It appears the first occurred on the night of the shooting. Carey could not recall this lineup taking place, had glass in his eyes (from the shooting because the shot came through the window), and no record of the lineup appeared in the police report, but Faigh testified that Carey identified the picture of Sims as the shooter. The second lineup occurred a day or two later in the hospital and Carey merely indicated that the picture of Sims "looked like" the shooter. Carey also testified he was shown a single picture of Sims in the hospital. Although he was unable to recall precisely when this occurred, he remembered his parents were present in the room. The third lineup took place two weeks later and its result is not indicated in the record. Carey simply testified, "about two weeks later ... I talked to John Faigh—and he put me under quite a bit of stress when he asked me. He was asking me a number of questions that irritated me to no end to say the least. And I don't know what he was trying to accomplish, but I was not happy." A fourth lineup occurred with Wicks and resulted in a positive identification. Finally, a fifth lineup occurred in which Carey admitted he was thrown off by a picture of Sims that included facial hair.

by an impermissibly suggestive pre-trial viewing of a picture of the Defendant by Mr. Carey." On July 15, 1995, the trial court dismissed the motion. Its response in full was: "The court has examined this alleged error and having further examined its notes, now determines that it believes that no error was committed or that no impermissible suggestive identification took place and that there is no merit to specification no. 1."

Sims did not fare much better on appeal. In an unpublished opinion, the Court of Appeals of Indiana opined that the "[e]xtra-judicial exhibition of a single photograph to a victim is an unduly suggestive identification procedure." However, the court noted the strength of Carey's in-court testimony, in particular that he looked Sims directly in the eye, noticed the light-colored patch of skin under one eye, and Sims was only two or three feet away from Carey when he was shot. These factors considered with the identification of Sims in photographic lineups convinced the court that the totality of the circumstanced provided a sufficient basis, independent of the improper photograph display, to support the admissibility of the in-court identification of Sims.

### D. Post-Conviction Proceedings

On February 8, 2012, in what was supposed to be an evidentiary hearing regarding a post-conviction relief petition filed by Sims, the information that formed the basis of this case was revealed. Graham Polando, a deputy prosecuting attorney for the state of Indiana stated in open court the following: "I consulted with Judge [Charles] Wicks who was the trial deputy [for Sim's attempted murder trial in 1994], he asked me not to disclose what he told me, but he indicated that the victim in this case identified the … defendant, Mr. Sims, only after hypnotism." This fact was never disclosed to defense counsel.

On June 8, 2012, the Elkhart County Superior Court held an evidentiary hearing to address the hypnotism issue. Carey testified that when viewing the lineup administered by detective Faigh the day after the shooting, he merely stated the individual "looked like" the assailant because "at the time [he] was not extremely sure." Carey also testified that the prosecuting attorney in the case, Wicks, brought up the idea of hypnosis saying "they could put [him] under hypnosis … but [indicated] there might be a problem in court in the future." Carey responded that he did not have a problem with any future legal issues regarding the hypnosis so long as he was able to recall the person who shot him. Carey also testified that Wicks set up the appointment and the state paid for it.

Carey testified that he attended one session of hypnosis in which he "fell asleep … [and] literally entered a dream state in which I … recall[ed] the shooting itself. And during that time I had another opportunity to uh, see the person that shot me." Sims's attorney then asked Carey:

Q:  Okay. So it was really only after this hypnosis that you were sure of the person was that shot you?

A:  Yeah.

Carey indicated the session took place months before trial "when [Wicks] and I first started talking about who the perpetrator was." After the session, Wicks created another photographic lineup and this time Carey was able to identify Sims due to the skin coloration on the face of the assailant that Carey noticed while reliving the night of the shooting under hypnosis. In fact, Carey stated that only "after the hypnotism the birthmark really stood out."

The court reconvened the hearing on June 12 and Charles Wicks, the prosecutor in Sims's case and now a Judge for the

Elkhart County Superior Court, testified. He stated that he could not recall whether Carey disclosed he had been hypnotized. A few breaths later Wicks defended not disclosing the hypnotism asserting it was not exculpatory in nature because Carey never wavered in his identification of Sims as the assailant. Wicks then testified that he gave Carey the information of the individual that performed the hypnotism because even though Carey had given a "fairly complete summary of what happened to him that evening, he said he would like to be able to recollect the evening better." The hypnotist was George Atkins, a licensed physician's assistant who Wicks knew from Kiwanis Club and had used in the past to help personal injury clients recall traumatic events.

Later in the hearing the court questioned deputy prosecuting attorney Polando regarding the statement Wicks made to him, asking whether the following quotation was correct: "'I never told Jim Stevens' (meaning Deputy Public Defender Stevens), 'that the victim was … only able to identify Mr. Sims after he was hypnotized." Polando confirmed this was correct, and added that Wicks also told him not to tell anyone. When Wicks retook the stand he stated he did not recall saying this to Polando.

On September 6, 2012, the Elkhart Superior Court entered an order denying Sims's Second Amended Petition for Post-Conviction Relief. In its order, the court identified the main issue as "whether Carey was able to sufficiently identify Petitioner before hypnosis." The court then discounted Wicks' statement to Polando that Carey was only able to identify Sims after hypnosis because Wicks "had not had time to consider the case before speaking with DPA Polando." The court also gave weight to the fact that other evidence contradicted this statement. The court noted that Officer Lerner testified that Carey

could identify the assailant from the beginning and that his description of the assailant matched Sims. The court then cited with approval the photographic lineup presented to Carey the day after the shooting in which Carey noted the picture of Sims "looked like" the assailant. The court concluded "[f]rom the record of the case, Carey was able to identify the Petitioner well before hypnosis."

After outlining the test established by *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the court noted the evidence was favorable to the defense, at a minimum as impeaching evidence, that would have been beneficial to the defense to discredit the state's only eye-witness. The court then immediately concluded that the evidence was not material because there was not a reasonable probability that disclosure would have changed the result of the proceeding. It was persuaded because the defense vigorously cross-examined Carey at trial and the Indiana Rules of Evidence only rendered inadmissible testimony of a witness as to matters recalled only through hypnosis. Thus, the court reasoned, Carey's testimony would not have been found inadmissible because Carey could sufficiently identify his assailant prior to hypnosis. The court also noted that Carey never identified anyone other than Sims from a photographic lineup and that his description of the assailant did not substantially change after hypnosis.

On July 15, 2013, the Court of Appeals of Indiana affirmed this decision. The court noted that under Indiana law, evidence derived from a hypnotically entranced witness should be excluded because the evidence is affected by confabulation, a process that causes the subject to fill in memory gaps with fantasy. The court also noted that because the subject is confident that the recalled memories are based in fact and accurate, the witness will likely be impervious to cross-exami-

nation. However, the court held that the state had carried its burden of demonstrating by clear and convincing evidence the witness's in-court identification had a factual basis independent of the hypnosis and therefore would have been admissible under the Indiana Rules of Evidence. The court noted that Carey testified at trial that he was able to look directly into the face and eyes of his assailant and that Carey's description of Sims the night of the shooting matched Sims. The court also noted Carey identified Sims three times in photographic lineups before he underwent hypnosis. The court found that Carey's identification had a sufficient pre-hypnosis foundation to have been admissible because Carey "was subjected to vigorous cross-examination regarding his numerous identifications of Sims." The court also gave weight to Carey's testimony at the evidentiary hearing that the hypnosis did not help him identify Sims, but rather made him "extremely sure" of his identification.

After the Indiana Supreme Court denied relief, Sims filed a petition for a writ of habeas corpus in federal court. The district court found that the Indiana Court of Appeals' decision was neither contrary to, nor involved an unreasonable application of, clearly established federal law. The court also found that the state court's decision was not based on an unreasonable determination of the facts. Accordingly, the district court denied habeas relief, but certified its appealability pursuant to 28 U.S.C. § 2253(c), finding that reasonable jurists could differ on whether the post-conviction relief court erred in finding relief was not warranted.

## II. ANALYSIS

We review *de novo* a district court's denial of a petition for writ of habeas corpus. *Carter v. Thompson*, 690 F.3d 837, 843 (7th

Cir. 2012). This review is governed by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The statute significantly limits the scope of our review; "habeas relief cannot be granted for persons in custody pursuant to a judgment of a state court unless the adjudication of the claim: '(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Czech v. Melvin*, 904 F.3d 570, 573 (7th Cir. 2018) (quoting 28 U.S.C. § 2254(d)). A federal court may issue a writ of habeas corpus under the "contrary to" clauses of AEDPA if the state court applied a rule different from law set forth in Supreme Court precedent, or if it decides a materially indistinguishable case differently than the Supreme Court. *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 405–406 (2000) (O'Connor, J., concurring). A state court decision is an "unreasonable application" if it correctly identifies the governing legal rule, but applies it unreasonably. *Williams v. Taylor*, 529 U.S. 362, 408–409 (2000).

On appeal, Sims's principal argument is that the state withholding the evidence that Carey was hypnotized prior to trial violated Sims's constitutional rights as established in *Brady*. Under *Brady*, a defendant's due process rights are violated if the state withholds favorable evidence from the defense that is material to the defendant's guilt or punishment. *Brady*, 373 U.S. at 87. The state court found, and the parties do not dispute, the hypnosis evidence would have been favorable to the defendant and it was not disclosed by the state. We agree. Therefore, the only issue before us is whether the

Indiana court's decision, that suppression of evidence that the state's star witness was hypnotized was not material under *Brady*, is contrary to or an unreasonable application of clearly established federal law.[2] Because the Indiana court's decision was both, we reverse the district court and grant the writ.

## A. "Clearly Established" Federal Law

The Supreme Court has clearly established that strong and non-cumulative impeachment evidence related to an important trial witness is material under *Brady.* A new trial is not "automatically require[d] … whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. A finding of materiality of the evidence is required under *Brady*." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (internal citations and quotations omitted). Evidence is material under *Brady* if "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433. A "reasonable probability" exists if the suppression of the favorable evidence "undermines confidence in the outcome of the trial." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

Nearly half a century ago, the Supreme Court held "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of the evidence affecting

---

2     Although the Court must generally discuss whether the error was harmless in its review of a petition for a writ of habeas corpus, the Supreme Court has made it clear that such an inquiry is unnecessary in *Brady* cases because the materiality standard contemplated by *Brady* is a higher burden on defendants than harmless error. *Kyles v. Whitley*, 514 U.S. 419, 435–36. Thus, if a petitioner establishes materiality under *Brady*, harmless error has been established and no further analysis is necessary.

credibility" justifies a new trial under *Brady*. *Giglio*, 405 U.S. at 154. In *Giglio*, the defendant was convicted of passing forged money orders. *Id.* at 151. The prosecution's case centered around the testimony of the defendant's co-conspirator, Robert Taliento, who was the only witness able to link the defendant to the crime. *Id.* Taliento confessed and described the scheme to a grand jury. *Id.* At trial, Taliento testified and identified the defendant as the instigator of the scheme. *Id.* Defense counsel vigorously cross-examined Taliento seeking to impeach him regarding a possible arrangement for prosecutorial leniency if he agreed to testify. *Id.* Taliento testified that no agreement had been reached, but the defendant later discovered he agreed to testify before the grand jury if the state agreed not to prosecute him. *Id.* at 151–52. Even though the impeachment evidence only went to his credibility, the Court found the information was material under *Brady. Id.* at 154.

Conversely, cases in which the Supreme Court has found the suppression of impeachment evidence was not material under *Brady* are easily distinguishable. For example, in *Turner*, the Court found suppressed impeachment evidence was not material because it was "largely cumulative of impeachment evidence petitioners already had and used at trial," and because the impeachment evidence only involved minor witnesses. *Turner v. United States*, 137 S. Ct. 1885, 1894 (2017).

Thus, the Supreme Court has long recognized that suppression of strong and non-cumulative evidence related to the credibility of an important witness is material under *Brady*, at least when the witness's testimony is critical to the prosecution's case. *See also Kyles*, 514 U.S. at 441–42 (holding that the state's case relied heavily on the testimony of eyewitnesses who identified the defendant as the murderer, therefore failure to disclose impeachment evidence related to those witnesses

was material under *Brady*) and *Wearry v. Cain*, 136 S. Ct. 1002, 1007 (2016) (withholding impeachment evidence of state's star witness violated *Brady*).

### B. "Unreasonable Application of" and "Contrary to" Controlling Precedent

A close reading of the Indiana Court of Appeals' decision shows where that court went astray from the law established by the Supreme Court of the United States. The state court actually acknowledged that "[e]vidence derived from a hypnotically entranced witness is inherently unreliable as not having probative value and is therefore inadmissible." 990 N.E.2d 523, 2013 WL 3526759 at *4 (Ind. Ct. App. 2013), citing *Rowley v. State*, 483 N.E.2d 1078, 1081 (Ind. 1985). *Rowley*, in turn, followed *Strong v. State*, 435 N.E.2d 969, 970 (Ind. 1982), which reviewed case law from around the country in rejecting hypnotically enhanced testimony. *Rowley* and *Strong* had gone on to hold that a witness who has undergone hypnosis may testify to identify a wrongdoer in a criminal trial, nevertheless, if the prosecution can show by clear and convincing evidence that the in-court identification has a sufficient independent factual basis.

In Sims's case, the Indiana Court of Appeals veered away from the *Brady* materiality standard. Instead of deciding whether the concealed evidence was important enough to undermine confidence in the result of the trial without it, the state court analyzed whether Carey's in-court identification of Sims had a sufficient independent factual basis so as to have been *admissible*. We assume that the finding of admissibility was correct under state law. But the state court then made the leap that was contrary to, and an unreasonable application of, *Brady* and its progeny: it concluded that because Carey's

testimony would still have been admissible, "it is not reasonably probable that the outcome of Sims's trial would have been different had Carey's hypnosis been disclosed."

That was a clear error. *Brady*'s materiality standard is not an admissibility test. It requires the court to gauge the potential effects on the outcome of the trial if the concealed information had been available to the defendant. See *Smith*, 56 U.S. at 75–76; *Kyles*, 514 U.S. at 453–54; *Strickler*, 527 U.S. at 289–90. The Indiana court did identify *Brady*'s overarching rule, but failed to correctly apply, or even recognize, the materiality standard outlined by the Supreme Court. Courts must consider the overall strength of the prosecution case, the importance of the particular witness's credibility to the prosecution case, the strength of the concealed impeachment material, and how the concealed material compares to other attacks the defense was able to make on the witness's credibility. *See Kyles*, 514 U.S. at 441, 445, 451, 454; *Giglio*, 405 U.S. at 154–55; *Smith*, 565 U.S. at 76; *Wearry*, 136 S. Ct. at 1006–07.

*Giglio*, *Kyles*, *Wearry*, and *Smith* all involved concealment of strong and non-cumulative impeachment evidence for the witnesses whose credibility was critical to the prosecution cases. They provide a body of clearly established law showing when impeachment evidence is material under *Brady*. *Turner* and *Strickler*, by contrast, show that concealed impeachment evidence may not be material when the prosecution case is strong apart from the witness in question and when the concealed impeachment evidence would have added little weight to the defendant's attacks on the witness's credibility.

Concealing the hypnosis of Carey in this case falls on the material side of the line mapped by these Supreme Court cases. Without Carey's identification of Sims as the shooter, the

prosecution had no case. No physical evidence tied Sims to the shooting. His presence by the dumpster shortly after the shooting was suspicious, of course, but far short of what would have been needed to convince a jury to convict.

The fact that Carey had been hypnotized would have undermined his credibility and changed his cross-examination quite dramatically. As the Supreme Court explained in *Rock v. Arkansas*, 483 U.S. 44, 59–60 (1987), there are several serious problems that undermine the accuracy and credibility of hypnotically enhanced testimony:

> Responses of individuals to hypnosis vary greatly. The popular belief that hypnosis guarantees the accuracy of recall is as yet without established foundation and, in fact, hypnosis often has no effect at all on memory. The most common response to hypnosis, however, appears to be an increase in both correct and incorrect recollections. Three general characteristics of hypnosis may lead to the introduction of inaccurate memories: the subject becomes "suggestible" and may try to please the hypnotist with answers the subject thinks will be met with approval; the subject is likely to "confabulate," that is, to fill in details from the imagination in order to make an answer more coherent and complete; and, the subject experiences "memory hardening," which gives him great confidence in both true and false memories, making effective cross-examination more difficult.

Essentially, "[n]ot only do hypnotized witnesses find it difficult to distinguish their original memories from those brought out under hypnosis, but they also tend to become more confident about their recall despite the fact that it might contain false recollections." Edie Greene, Kirk Heilbrun, William H. Fortune, & Michael T. Nietzel, Wrightsman's Psychology and the Legal System 140 (6th ed. 2007); see also Steven Jay Lynn, Elza Boycheva, Amanda Deming, Scott O. Lilienfeld, & Michael N. Hallquist, Forensic Hypnosis: The State of the Science, *in* Psychological Science in the Courtroom: Consensus and Controversy, 85 (Jennifer L. Skeem, Kevin S. Douglas, & Scott O. Lilienfeld 2009) ("23 studies have shown that hypnosis either increases confidence relative to a nonhypnotic group, or participants confidently report inaccurate memories of events they earlier denied occurred when they were not hypnotized").

The concealed hypnosis thus explains Carey's puzzling statement at trial that his memory of the incident actually improved over time.[3] But more fundamentally, it calls into question everything Carey said at trial. Based on the Supreme Court's view of hypnosis, Carey would not know what he was able to recall independent of the hypnosis, nor what he was able to recall because of the hypnosis, or whether any of his testimony was true or based on fantasy. This is made more troubling by the fact that Carey provided significantly more information at trial than he did any time before trial. Carey discussed in detail looking the assailant square in the eyes, that he remembered witnessing a small patch on the assailant's jacket, that he remembered a small birthmark on the assailant's

---

[3] As noted above, Carey stated at trial, "I recall—I did not recall it at the time. Later on I did recall a hood, and it was part of the way up."

face. As the defense pointed out at trial, none of these details were in Carey's description to Officer Lerner nor did they appear in the police report. It is reasonable to infer the jury found these details persuasive without knowing that Carey's recollection of them might have been due entirely to the hypnosis session.

The "memory hardening" effect of hypnosis can explain Carey's admission during post-conviction proceedings that he was sure of who the person was who shot him only after being hypnotized. The effect Carey's increased confidence likely had on the jury helps to undermine our confidence in the verdict. Decades of research confirms that the confidence with which eyewitnesses identify criminal defendants can be a powerful predictor of verdicts *regardless of the accuracy of the identification*. The more confident the eyewitness is in his identification, the more likely the jury is to believe that the identification is accurate and to convict the defendant. See Brian L. Cutler, Steven D. Penrod, & Thomas E. Stuve, Juror Decision Making in Eyewitness Identification Cases, 12 Law and Human Behavior 41 (1988); Steven G. Fox & H.A. Walters, *The Impact of General versus Specific Expert Testimony and Eyewitness Confidence upon Mock Juror Judgment*, 10 Law and Human Behavior 215 (1986); Michael R. Leippe, Andrew P. Manion, & Ann Romanczyk, *Eyewitness Persuasion: How and How Well Do Fact Finders Judge the Accuracy of Adults' and Children's Memory Reports?*, 63 Journal of Personality & Social Psychology 181 (1992); Lynn et al. at 85; Gary L. Wells, *What Do We Know About Eyewitness Identification?*, 48 American Psychologist 553, 564 (1993); Gary L. Wells, R.C.L. Lindsay, & Tamara J. Ferguson, *Accuracy, Confidence, and Juror Perceptions in Eyewitness Identification*, 64 Journal of Applied Psychology 440 (1979).

It is not difficult to imagine what Sims's lawyer could have done at trial with the knowledge that Carey had been hypnotized. The known effects of hypnosis could explain Carey's confidence, his claim that his memory of the shooting had improved over time, and the otherwise benign changes in his descriptions of the shooter. Reasonable judges cannot be confident that, if the jury had known that Carey had been hypnotized before he identified Sims at trial, they would have found his identification beyond reasonable doubt.

Given the well-known problems that hypnosis poses for witnesses' memories, we can be confident that Carey's identification testimony would have been subjected to withering cross-examination. As noted, the prosecution's case against Sims depended completely on Carey's credibility, which the suppressed hypnosis evidence would have severely undermined. The evidence would have cast doubt for the jury not only on Carey's in-court identification, but also on Carey's credibility as a witness more generally, including the accuracy of his prior identifications of Sims. The jury saw Carey identify Sims only once, in court. The prior identifications were heard only secondhand. If the jurors had known that Carey needed to be hypnotized to make the in-court identification, they would have been less likely to believe Carey was confident that Sims was his assailant, and therefore that his identification was accurate. From there and without the ability to observe Carey make his prior, untainted identifications, the jury could easily have questioned Carey's overall credibility as an eyewitness.

The Indiana appellate court noted that Carey was able to describe the clothing and physical attributes of the assailant who matched Sims's clothing and physical attributes when he was discovered on the scene. However, the trial court transcript illustrates the defense cross-examined Carey vigorously

and pointed out several instances in which his description of the assailant did not match Sims's clothing or physical attributes the night of the incident. The undisputed details merely provide the shooter was a black male with a large build wearing a three quarter length coat. This is not the kind of identification that instills confidence especially in a case that the prosecution described as being all about "the validity of Carey's identification."

The state court noted Carey identified Sims three times in photographic lineups before hypnosis. Carey had glass in his eyes and did not recall the first lineup and was unable to identify the shooter in a lineup two days later. Furthermore, significant doubt was cast on these lineups by the fact that Carey testified that he was initially only shown a single picture. The defense moved for a mistrial, which was denied, and the issue was affirmed on appeal. However, the Indiana Court of Appeals affirmed this decision because they were convinced the totality of the circumstances constituted a sufficient independent basis to cure any unduly suggestive procedures. But the suppressed evidence of hypnosis now brings this ruling into question.

The dissent assails our opinion by asserting that Carey never wavered in his identification of Sims. This does not explain why Wicks felt it necessary to take the risk of setting up a hypnosis session for Carey without disclosing it. Nor does it appear to take into account the instances in which Carey equivocated. Furthermore, the only indication as to when the hypnosis session took place is Carey's testimony at the post-conviction evidentiary hearing that it was months before trial when he and Wicks "first started talking about who the perpetrator was."

Finally, these problems with hypnosis undercut the Indiana court's final reason for refusing post-conviction relief: Carey's testimony indicated he was able to identify the assailant, but hypnosis was able to make him "extremely sure." No one knows what effect the hypnosis had on Carey and it also belies the record for reasons discussed above.

Considering the overall weakness of the prosecution case without Carey, the importance of his testimony, the explosive strength of the concealed hypnosis evidence, and the relatively mild impeachment of Carey that the defense managed at trial, habeas relief is required. The post-*Brady* cases involving strong concealed impeachment material for key prosecution witnesses—*Smith*, *Giglio*, *Wearry*, and *Kyles*—show beyond reasonable dispute that the prosecutor's deliberate concealment of the hypnosis evidence undermined confidence in the verdict that has kept Sims in prison for more than twenty years.

### III. CONCLUSION

Given the suppression of the evidence was clearly a violation under *Brady*, the writ of habeas corpus should have been granted. Therefore, we reverse and remand the case to the district court with instructions to grant the writ of habeas corpus.

BARRETT, *Circuit Judge*, dissenting. I dissent from the
majority opinion because it fails to give the Indiana Court of
Appeals the deference required by 28 U.S.C. § 2254(d). Under
that provision, a federal court may grant habeas relief only if
the state court proceedings (1) "resulted in a decision that was
contrary to, or involved an unreasonable application of,
clearly established Federal law, as determined by the
Supreme Court of the United States"; or (2) "resulted in a
decision that was based on an unreasonable determination of
the facts in light of the evidence presented in the State court
proceeding." The majority holds that the Indiana Court of
Appeals' decision satisfies § 2254(d)(1). I disagree. Even
though I think that the undisclosed evidence of Carey's
hypnosis constitutes a *Brady* violation, it was neither contrary
to, nor an unreasonable application of, clearly established
federal law for the Indiana Court of Appeals to conclude
otherwise.

I.

The Indiana Court of Appeals' decision to deny Sims's
petition for post-conviction relief was not "contrary to"
clearly established law as determined by the Supreme Court
of the United States. A decision is "contrary to" clearly
established federal law if it (1) "applies a rule different from
the governing law set forth in our cases" or (2) "decides a case
differently than [the Supreme Court] ha[s] done on a set of
materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685,
694 (2002). To apply this standard, we must first consider
what rule has been clearly set forth in the Supreme Court's
caselaw.

The three elements of a *Brady* violation have been clearly
established, including the materiality prong at issue here. *See,*

*e.2727g.*, *Goudy v. Basinger*, 604 F.3d 394, 400 (7th Cir. 2010). Evidence is material if there is "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (internal quotation marks and citation omitted). A "reasonable probability" is one that "undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (internal quotation marks omitted) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)). In addition, the holding in *Giglio v. United States*, 405 U.S. 150, 154 (1972), that impeachment evidence "falls within the *Brady* rule," is likewise clearly established. *See Bagley*, 473 U.S. at 676; *Collier v. Davis*, 301 F.3d 843, 848 (7th Cir. 2002).

The majority's first error comes in its description of the general rule that *Brady* establishes with respect to impeachment evidence. The Supreme Court has not held, as the majority would have it, that "'[w]hen the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of the evidence affecting credibility' *justifies a new trial under* Brady." Maj. Op. at 18 (emphasis added) (citing *Giglio*, 405 U.S. at 154). The italicized phrase is the majority's; the full sentence from *Giglio* is this: "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of the evidence affecting credibility falls within [*Brady*'s] general rule." *See Giglio*, 405 U.S. at 154 (quotation omitted). Again, that general rule asks whether the undisclosed evidence is material. And materiality—whether the evidence at issue is exculpatory or impeaching—is always a fact-intensive inquiry, as the sentences in *Giglio* immediately following the one that the majority quotes make clear:

> When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [*Brady*'s] general rule. *We do not, however, automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. A finding of materiality of the evidence is required under Brady.*

*Id.* at 154 (emphasis added) (internal quotation marks, citations, and alteration omitted). In other words, impeachment evidence related to a key witness is material *only if* it undermines confidence in the verdict. *See id.* at 154–55 (suppressed evidence of bias that called into question a key witness's entire testimony was material); *see also Kyles*, 514 U.S. at 441–42 (undisclosed contradictory statements by a key witness that arguably pointed to a suspect other than the defendant were material because they "substantially reduced" or "destroyed" the witness's value). To be sure, impeachment evidence related to a key witness is more likely to be material than impeachment evidence related to a bit player. But contrary to the majority's suggestion, the Supreme Court has never announced a hard-and-fast rule requiring a new trial when non-cumulative evidence related to the credibility of an important witness is suppressed. Even when it comes to a star witness, *Giglio* and its progeny require courts to evaluate whether the suppressed evidence is in fact material—not merely to assume it.

The majority's second error lies in its assertion that the Indiana Court of Appeals confused the *Brady* materiality standard with the Indiana Rules of Evidence. The Supreme

Court has explained that "[a] federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in our cases…." *Bell*, 535 U.S. at 694. According to the majority, the state court made that very error here—it says that the state court concluded that the suppressed evidence was not material because Carey's identification would still have been admissible under state law. Maj. Op. at 20. But that fundamentally misreads the state court opinion. The Indiana Court of Appeals did explain that "[e]vidence derived from a hypnotically entranced witness" is inadmissible under state law unless "the State … demonstrate[s] by clear and convincing evidence that the witness's 'in-court identification has a factual basis independent of the hypnotic session.'" Ind. Ct. App. Op. at 7–8 (quoting *Rowley v. State*, 483 N.E.2d 1078, 1081 (Ind. 1985)). Yet it did not analyze Sims's *Brady* claim under that standard. When it moved to the *Brady* issue, the court squarely identified and applied *Brady*.

The Indiana Court of Appeals began by describing the trial court's post-conviction decision, which held that while the evidence of hypnosis satisfied the first two prongs of *Brady* because it was both favorable and suppressed, it failed to satisfy the third prong because it was not material. *See* Ind. Ct. App. Op. at 8. The trial court fully recited the *Brady* standard, including the rule that "[e]vidence is material if there is a reasonable probability that disclosure would have changed the result in the proceeding." After discussing the evidence in detail, the trial court concluded: "The evidence presented provides sufficient confidence in the verdict. The record reveals that Carey was able to identify Defendant before hypnosis. Thus the Court finds that the hypnosis disclosure

would not have changed the outcome, and its nondisclosure did not amount to a *Brady* violation."

The Indiana Court of Appeals reviewed this reasoning, setting much of it forth verbatim, and agreed that the evidence was not material given the counterbalancing strength of the admissible identification: Carey got a good look at the assailant, gave a detailed description that matched Sims, and identified Sims in multiple pre-hypnosis photo lineups. It concluded that "the findings of fact and the record as a whole support the post-conviction court's determination that it is not reasonably probable that the outcome of Sims's trial would have been different had Carey's hypnosis been disclosed." Ind. Ct. App. Op. at 10. That is the *Brady* standard. *See Turner*, 137 S. Ct. at 1893 (explaining that evidence is material if there is "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different" (quotation omitted)). The majority is plainly correct that "*Brady*'s materiality standard is not an admissibility test," Maj. Op. at 20, but neither the Indiana Court of Appeals nor the trial court treated it like one.

A state court decision is "contrary to" clearly established law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts." *Bell*, 535 U.S. at 694. Here, there is no question that the state court applied the *Brady* materiality standard, and there is no attempt to identify a Supreme Court case with materially indistinguishable facts. Thus, the state court decision was not "contrary to" clearly established federal law.

II.

The majority's stronger argument is that the Indiana Court of Appeals unreasonably applied *Brady*'s materiality prong to this set of facts. Section 2254(d)(1) prohibits us from approaching this question de novo; thus, we cannot simply ask whether the suppressed evidence of hypnosis creates a reasonable probability of a different result. Instead, we must ask the question that § 2254(d)(1) demands: whether it was unreasonable for the state court to conclude that evidence of hypnosis did not create a reasonable probability of a different result.

This is a high bar: the state court's application of federal law "must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (internal quotation marks and citation omitted). A prevailing habeas petitioner must "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Kidd v. Lemke*, 734 F.3d 696, 703 (7th Cir. 2013) ("We must deny the writ if we can posit arguments or theories that could have supported the state court's decision, and if fairminded jurists could disagree about whether those arguments or theories are inconsistent with Supreme Court holdings."). The Indiana Court of Appeals' conclusion that the evidence of hypnosis was not material—and thus that failure to disclose the evidence did not amount to a *Brady* violation—does not rise to that level.

The majority finds fault in multiple aspects of the Indiana Court of Appeals' reasoning. Many of its concerns, however, are objections to the facts found by that court. And without clear and convincing evidence that the state court was wrong, its factual determinations are not open for debate. *See* 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").[1]

Notably, the majority almost entirely discounts the facts that support the Indiana Court of Appeals' conclusion that the suppressed evidence was immaterial. The state court found that Carey looked directly into the face of Sims in fair, outside lighting at the time of the shooting; offered a detailed description of Sims on-scene; identified Sims in a photo array at the hospital emergency room; and identified Sims again two days later in a photo array at the prosecutor's office. The description and identifications are crucial because they all occurred well before Carey underwent a session of hypnosis and thus bolster the reliability of the in-court identification despite the evidence of hypnosis.

---

[1] Though the majority does not hold, and Sims does not argue, that the state court decision was "based on an unreasonable determination of the facts" under § 2254(d)(2), some of the language in the opinion seems to at least raise the question. It is therefore worth noting that unreasonableness under § 2254(d)(2) is a very stringent standard. A factual determination is unreasonable if it is "arbitrary," *Ben-Yisrayl v. Buss*, 540 F.3d 542, 549 (7th Cir. 2008), but not if reasonable minds could disagree on the finding in question, *Wood v. Allen*, 558 U.S. 290, 301 (2010). In addition, we have held that "§ 2254(e)(1) provides the mechanism for proving unreasonableness." *Ben-Yisrayl*, 540 F.3d at 549.

The majority is particularly skeptical of the Indiana Court of Appeals' finding that Carey identified Sims three times in photo lineups before hypnosis. Maj. Op. at 25–26. It claims that "significant doubt was cast on these lineups by the fact that Carey testified that he was initially only shown a single picture." *Id.* But there was a factual dispute on this point that the Indiana Court of Appeals resolved: it concluded that Carey was presented with a picture lineup in the hospital emergency room.[2] The majority has not attempted to demonstrate by clear and convincing evidence that this finding is wrong—nor could it, because Sims has not attempted to do so. Thus, we must accept the state court's finding that Carey positively identified Sims in multiple pre-hypnosis photo lineups.

Relatedly, the majority also suggests that Carey was able to identify Sims only *after* hypnosis. *See* Maj. Op. at 23, 26; *see also id.* at 12–13. In the majority's view, this conclusion is most consistent with the trial record and best explains why Carey or the prosecutor would have "felt it necessary" to undergo

---

[2] This issue was first raised when Sims moved for a mistrial after testimony from Carey in which "he indicated that he might have been shown a single picture of Sims before he was shown photo arrays which included Sims's picture." The trial court denied the motion and the court of appeals affirmed, noting that "there was other testimony and evidence to the effect that Carey had never been shown a single photograph, but was only shown arrays of six or seven photos," and that in any event, "there was a sufficient basis, independent of any improper photo display, to support the admissibility of the in-court identification of Sims." The issue arose again in the post-conviction proceedings, in which the state courts found that "when the police arrived at the hospital emergency room, they showed Carey photos of Sims and several other men, and Carey positively identified Sims as his assailant."

hypnosis at all. *Id.* at 26. But just as § 2254 does not permit us to review a state court's application of federal law de novo, it also does not permit us to reweigh evidence according to our own best reading of the trial record. Both the state trial court and the Indiana Court of Appeals explicitly rejected the notion that Carey identified Sims only after hypnosis: "the contention that Carey was 'only' able to identify Petitioner following the hypnosis is at odds with other credible evidence … in the record.… From the record of the case, Carey was able to identify Petitioner well before hypnosis." Ind. Ct. App. Op. at 6–7 (quoting the trial court); *see also id.* at 9–10. The majority is not free to question this finding.

After deciding for itself which facts are undisputed, the majority frames the materiality question this way: could a fairminded judge be confident in Sims's conviction where the only evidence was Sims's proximity to the scene of the crime and Carey's solid but imperfect on-scene description? *See* Maj. Op. at 21, 25 (acknowledging Sims's suspicious proximity to the scene and citing Carey's description as the only other "undisputed details"). But that framing stacks the deck by sifting out evidence on which the state court relied in applying *Brady*—most significantly, Carey's identification of Sims in the photo arrays. Absent clear and convincing evidence that the state court's factual findings were wrong—which again, is not something that the majority undertakes to show—we are required to take the facts as the state court found them. 28 U.S.C. § 2254(e)(1).[3]

_____

[3] The majority claims that I "assail [its] opinion" by contesting its factual findings with my own. Maj. Op. at 26. But that misses the point entirely. Section 2254 requires us to accept the facts as the state court presented them and determine whether, on those facts, the state court's legal

Doing that leaves us with the following facts. Carey gave an on-scene description of the shooter that matched, in many respects, a person crouching in the bushes behind a nearby dumpster. But the match was not perfect: Carey described a person with short hair and wearing boots, and Sims was apprehended apparently wearing a hat or hood and Nikes. Carey identified Sims in multiple pre-hypnosis photo arrays and "never identified any other as his assailant." At some point, before trial, Carey underwent a single session of hypnosis to improve his memory of the event. There is no record of what happened during this session. At trial, Carey gave a more robust description of his assailant than the one given on-scene—adding details like the discoloration under Sims's eye and the patch on his jacket—but he did not contradict his initial description. He testified that his memory of certain details had improved over time. Defense counsel cross-examined Carey on all inconsistencies with and additions to his initial description of the shooter. An officer testified that, from the very beginning, Carey said that he could identify the assailant, and that Carey's description of the assailant matched Sims. The government never found the gun used to shoot Carey. The jury found Sims guilty of attempted murder.

The Indiana trial court drew two important conclusions from these facts in its post-conviction review. First, it decided that the government had proven by clear and convincing evidence that Carey's in-court identification of Sims had a sufficient factual basis independent of hypnosis. Second, the

conclusions constituted an unreasonable application of federal law. I don't contest any of the majority's factual findings, only its authority to make them.

court noted that the distinctive elements of Carey's trial testimony, compared to his initial description, "were fully developed, examined and vigorously discussed in cross examination," which gave the jury the opportunity to weigh Carey's credibility regarding the differences. Given that the government would still have been able to introduce a strong, reliable in-court identification of Sims and that, in the court's view, many of the problems raised by hypnosis were already addressed by robust cross-examination, the court held that the "evidence presented provides sufficient confidence in the verdict." The Indiana Court of Appeals agreed. It emphasized the independent strength of the in-court identification and the "vigorous cross-examination" of Carey before holding that "it is not reasonably probable that the outcome of Sims's trial would have been different had Carey's hypnosis been disclosed." Ind. Ct. App. Op. at 10.

That decision does not involve an objectively unreasonable application of clearly established federal law. The state courts suggested that the undisclosed evidence would have been largely cumulative, and therefore not material, because the defense was already able to cross-examine Carey about the differences in his testimony. The Supreme Court has held that "largely cumulative" impeachment evidence is not material. *See Turner*, 137 S. Ct. at 1894. The majority acknowledges *Turner*'s holding but disagrees that the hypnosis evidence would have been cumulative. In its view, the newly discovered evidence of hypnosis would have "changed [Carey's] cross-examination quite dramatically" and "calls into question everything Carey said at trial." Maj. Op. at 21, 23. But neither outcome is obviously true.

Indeed, had the evidence of hypnosis been disclosed, defense counsel would have likely emphasized the dangers of hypnotically-refreshed testimony discussed in *Rock v. Arkansas*. *See* 483 U.S. 44, 59–60 (1987). At best, however, the effect of that argument would have been to undermine the reliability and credibility of any part of Carey's testimony that could not be traced to his memory prior to hypnosis. It was not objectively unreasonable, then, for the state court to conclude that the impeachment evidence was largely cumulative: the vulnerable parts of Carey's testimony— describing the discoloration under Sims's eye and the patch on his jacket—were already undermined by defense counsel's cross-examination stressing that such details appeared nowhere in Carey's on-scene description.

But that debate is at the periphery. Under Indiana law evidence derived from hypnosis is inadmissible. *See* Ind. Ct. App. Op. at 7 (citing *Rowley*, 483 N.E.2d at 1081). Thus, the question is not whether cross-examination of hypnotically-refreshed testimony would have been effective—notably, the question that *Rock* speaks to.[4] The question is whether *without* the hypnotically-refreshed testimony, a reasonable jurist could be confident in the conviction. Acknowledging the effectiveness of defense counsel's cross-examination was one

---

[4] *Rock*'s discussion of the dangers of hypnotically-refreshed testimony and the ineffectiveness of cross-examination on such testimony took place in the context of considering the admissibility of *post*-hypnosis testimony. *See* 483 U.S. 44, 53, 61 (1987) (distinguishing between post-hypnosis testimony and testimony that a litigant could "prove to be the product of prehypnosis memory" for the purposes of its analysis). Notably, *Rock*'s holding actually offered some protection for hypnotically-refreshed—that is, derived from hypnosis—testimony. *See id.* at 61 (post-hypnosis testimony is not categorically unreliable).

way for the state court to test this question—i.e., because the defense counsel cast substantial doubt on the reliability of the hypnotically-refreshed testimony, a reasonable jurist could be confident that the pre-hypnosis evidence and testimony drove the verdict.

As an additional ground for its immateriality decision, however, the state court considered the pre-hypnosis evidence—and admissible identification related to that evidence—in isolation and expressed confidence that the jury would have still decided to convict. The only additional boost that the evidence of hypnosis would have given Sims's defense counsel on cross-examination under these circumstances would have been to raise questions about why Carey underwent hypnosis in the first place. Certainly, the jury might have some discomfort with the fact that Carey felt the need to undergo hypnosis—as the majority does, and as I do. But the key is the reliability of Carey's identification of Sims.

Evidence of hypnosis and Carey's reduced credibility over time could not have retroactively undermined the reliability of his contemporaneous description of the events and the assailant or his multiple pre-hypnosis photo-lineup identifications of Sims. *Cf. Neil v. Biggers*, 409 U.S. 188, 199–200 (1972) (identifying "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness …, and the length of time between the crime and the [identification]" as factors relevant to reliability). Nor could it have changed the fact that the police discovered Sims peering down on the scene behind a nearby dumpster. Thus, unlike

the cases that the majority cites, in which the undisclosed evidence either contradicted the witness's in-court identification or shattered the credibility of a witness with no contemporaneous corroboration for his in-court identification, Carey's contemporaneous description and pre-hypnosis identifications were independently reliable and consistent with his in-court identification. *Cf. Wearry v. Cain*, 136 S. Ct. 1002, 1004–05 (2016) (per curiam) (undisclosed statements suggested that the witness was attempting to frame the defendant; undisclosed evidence suggested that the witness was biased; undisclosed medical evidence suggested that it would have been impossible for the defendant to have done the things that the witness described); *Smith v. Cain*, 565 U.S. 73, 74–76 (2012) (witness's undisclosed contemporaneous statements directly contradicted the testimony supporting his in-court identification); *Kyles*, 514 U.S. at 441–42 (witness's undisclosed contemporaneous statements contradicted the in-court identification).

In short, the state court concluded that the evidence of hypnosis was not only cumulative but also comparatively weak in light of the strength and reliability of Carey's pre-hypnosis description and identifications. That conclusion is not "beyond any possibility for fairminded disagreement." *See Harrington*, 562 U.S. at 103. Here, Carey's *hypnotically-refreshed* testimony was not "the *only* evidence linking [Sims] to the crime." *See Smith*, 565 U.S. at 76. With a solid on-scene description, multiple untainted photo-array identifications, and an in-court identification by the victim—not to mention Sims's suspicious behavior and proximity to the scene of the crime—a fair-minded jurist could be confident in the jury's verdict, even if we are not. *See Kidd*, 734 F.3d at 703.

\* \* \*

Again, if I were deciding the question de novo, I would agree with the majority that the suppressed evidence of hypnosis undermined confidence in the verdict. But because I can't say that the Indiana Court of Appeals' decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Harrington*, 562 U.S. at 103, I would affirm the district court's denial of Sims's habeas corpus petition.